Eric I. Abraham (eabraham@hillwallack.com)
William P. Murtha (wmurtha@hillwallack.com)
**HILL WALLACK LLP**
21 Roszel Road
Princeton, NJ 08540
T: (609) 924-0808
F: (609) 452-1888
*Attorneys for Defendant, RK Pharma, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| AMERICAN REGENT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 3:24-cv-1169 (BRM) (CLW) |
| | ) | |
| RK PHARMA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**RK PHARMA, INC.'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS**

Defendant RK Pharma, Inc., by and through its counsel, hereby respond to the allegations set forth in Plaintiff American Regent, Inc.'s Complaint for Patent Infringement. This Answer is based on RK Pharma, Inc.'s current knowledge as to its own activities, and on information and belief as to the activities of others. If not specifically admitted herein, the allegations of the Complaint are denied. The headings in Plaintiff's Complaint are copied herein for convenience only, and any allegations in such headings are denied.

## NATURE OF THIS ACTION

1. This is an action for patent infringement under the patent laws of the United States, 35 U.S.C. § 100 *et. seq.*, arising from the RK Pharma Group's submission to the United States Food and Drug Administration ("FDA") of Abbreviated New Drug Application No. 218537 ("the ANDA") which contained a certification of the type described in Section 505(j)(2)(A)(vii)(IV) of the Federal Food, Drug, and Cosmetic Act ("Paragraph IV Certification") seeking approval to engage in the commercial manufacture, use, or sale of generic versions of ARI's Tralement® (trace elements injection 4*, USP) in 1 mL single-dose vials and 5 mL Pharmacy Bulk Package vials and Multrys® (trace elements injection 4*, USP) drug products ("the ANDA Products") prior to the expiration of United States Patent No. 11,786,548 ("the '548 patent" or "the patent-in-suit").

**ANSWER:** Defendant admits that this action purports to arise under the patent laws of the United States, 35 U.S.C. § 100 et. seq., arising from the RK Pharma, Inc.'s ("RK Pharma" or "Defendant") submission to the United States Food and Drug Administration ("FDA") of Abbreviated New Drug Application No. 218537 ("the ANDA") which contained a certification of the type described in Section 505(j)(2)(A)(vii)(IV) of the Federal Food, Drug, and Cosmetic Act ("Paragraph IV Certification") seeking approval to engage in the commercial manufacture, use, or sale of generic versions of American Regent, Inc.'s ("ARI" or "Plaintiff") Tralement® (trace elements injection 4*, USP) in 1 mL single-dose vials and 5 mL Pharmacy Bulk Package vials and Multrys® (trace elements injection 4*, USP) drug products ("the ANDA Products") prior to the expiration of United States Patent No. 11,786,548 ("the '548 patent" or "the patent-in-suit"). Defendant is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Complaint and therefore denies them.

**THE PARTIES**

2. ARI is a corporation organized and existing under the laws of the State of New York, with a principal place of business at 5 Ramsey Road, Shirley, New York 11967.

**ANSWER:** On information and belief, and based upon the Complaint filed in this case, ARI is a corporation organized and existing under the laws of the State of New York, with a principal place of business at 5 Ramsey Road, Shirley, New York 11967. Defendant is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 of the Complaint and therefore denies them.

3. On information and belief, Defendant RK Pharma, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 401 N. Middletown Road, Building 215/215A, Pearl River, New York 10965 and a regular and established place of business at 23 Orchard Road, Suite 180, Skillman, New Jersey 08558 through its operations with Defendant VGYAAN, a regular and established place of business at 49 Napoleon Court, Somerset, New Jersey 08873 through its operations with Defendant Apicore, and a regular and established place of business at 15 Corporate Pl S, Piscataway, New Jersey 08854 through its operations with Defendant Archis.

**ANSWER:** Paragraph 3 states a legal conclusion to which no response is required. To the extent an answer is required, Defendant RK Pharma, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 401 N. Middletown Road, Building 215/215A, Pearl River, New York 10965. All other entities referred to in Paragraph 3 have been dismissed from this Action.

4. On information and belief, Defendant VGYAAN is an entity organized and existing under the laws of the State of New Jersey, with a principal place of business at 23 Orchard Road,

Suite 180, Skillman, New Jersey 08558.

**ANSWER:** Paragraph 4 states a legal conclusion to which no response is required. To the extent an answer is required, VGYAAN has been dismissed from this Action.

5. On information and belief, Apicore is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business at 49 Napoleon Court, Somerset, New Jersey 08873.

**ANSWER:** Paragraph 5 states a legal conclusion to which no response is required. To the extent an answer is required, Apicore has been dismissed from this Action.

6. On information and belief, Defendant Archis is an entity organized and existing under the laws of the State of Delaware, with a principal place of business at 15 Corporate Pl S, Piscataway, New Jersey 08854.

**ANSWER:** Paragraph 6 states a legal conclusion to which no response is required. To the extent an answer is required, Archis has been dismissed from this Action.

7. On information and belief, RK Pharma, Inc., VGYAAN, Apicore, and Archis, acted in concert to prepare and submit the ANDA with a Paragraph IV Certification to FDA.

**ANSWER:** Paragraph 7 states a legal conclusion to which no response is required. To the extent an answer is required, RK Pharma, Inc. filed the ANDA. Defendant RK Pharma denies any remaining allegation.

## JURISDICTION AND VENUE

8. This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 100 *et. seq.*, and jurisdiction is proper under 28 U.S.C. §§ 1331, 1338(a),

2201, and 2202.

**ANSWER:** Paragraph 8 states a legal conclusion to which no response is required. To the extent an answer is required, Defendant RK Pharma will not contest subject matter jurisdiction solely for the purposes of this Action. Other Defendants have been dismissed from this Action.

9. Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400(b), at least because, on information and belief, RK Pharma, Inc., with the aid of VGYAAN, Apicore, and Archis, submitted the ANDA with a Paragraph IV Certification from VGYAAN's Skillman, New Jersey places of business and therefore the RK Pharma Group has committed acts of infringement and has a regular and established place of business in New Jersey for the purposes of venue.

**ANSWER:** Paragraph 9 sets forth legal conclusions based on alleged activities to which no response is required. To the extent an answer is required, RK Pharma admits only that it will not contest venue for the purposes of this Action. RK Pharma denies any remaining allegations of Paragraph 9, including but not limited to the allegation that RK Pharma submitted its ANDA "with the aid" of other entities. Furthermore, other entities referred to in Paragraph 9 have been dismissed from this Action.

10. Based on the facts and causes alleged herein, including infringement under 35 U.S.C. § 271(e)(2) by the ANDA with a Paragraph IV Certification and for additional reasons to be further developed through discovery, if necessary, this Court has personal jurisdiction over RK Pharma, Inc.

**ANSWER:** Paragraph 10 states a legal conclusion to which no response is required. To the extent an answer is required, RK Pharma Inc. will not contest personal jurisdiction solely for the purposes of this Action. RK Pharma denies any remaining allegations of Paragraph 10.

11. On information and belief, RK Pharma, Inc. has registered to do business with the State of New Jersey's Division of Revenue and Enterprise Services as a business operating in New Jersey under Business ID No. 0101052900. RK Pharma, Inc. has thus consented to personal jurisdiction in New Jersey.

**ANSWER:** Paragraph 11 states a legal conclusion to which no response is required. To the extent an answer is required, RK Pharma Inc. has registered to do business with the State of New Jersey's Division of Revenue and Enterprise Services as a business operating in New Jersey under Business ID No. 0101052900. RK Pharma, Inc. will not contest personal jurisdiction in New Jersey solely for the purposes of this Action.

12. On information and belief, VGYAAN has its principal place of business in the State of New Jersey and has registered to do business with the State of New Jersey's Division of Revenue and Enterprise Services as a business operating in New Jersey under Business ID No. 0600406976. VGYAAN has thus consented to personal jurisdiction in New Jersey.

**ANSWER:** Paragraph 12 states a legal conclusion to which no response is required. To the extent an answer is required, VGYAAN has been dismissed from this Action.

13. On information and belief, Apicore has its principal places of business in the State of New Jersey and has registered to do business with the State of New Jersey's Division of Revenue and Enterprise Services as a business operating in New Jersey under Business ID No. 0400670163. Apicore has thus consented to personal jurisdiction in New Jersey.

**ANSWER:** Paragraph 13 states a legal conclusion to which no response is required. To the extent an answer is required, Apicore has been dismissed from this Action.

14. On information and belief, Archis has its principal places of business in the State

of New Jersey and has registered to do business with the State of New Jersey's Division of Revenue and Enterprise Services as a business operating in New Jersey under Business ID No. 0450743031. Archis has thus consented to personal jurisdiction in New Jersey.

**ANSWER:** Paragraph 14 states a legal conclusion to which no response is required. To the extent an answer is required, Archis has been dismissed from this Action.

15. On information and belief, RK Pharma, Inc., VGYAAN, Apicore, and Archis, are affiliates that operate within the same corporate family.

**ANSWER:** Paragraph 15 states a legal conclusion to which no response is required. To the extent an answer is required, RK Pharma, Inc., VGYAAN, Apicore, and Archis, are affiliates within the same corporate family. RK Pharma denies any remaining allegations of Paragraph 15.

16. On information and belief, RK Pharma, Inc., VGYAAN, Apicore, and Archis act, operate, and/or hold themselves out to the public as a "vertically integrated" business such that RK Pharma, Inc. has an established and regular place of business in the State of New Jersey at least through activities performed in conjunction with VGYAAN LC, Apicore, and Archis.

**ANSWER:** Paragraph 16 states a legal conclusion to which no response is required. To the extent an answer is required, RK Pharma, Inc. is not contesting jurisdiction in this Action. The other entities have been dismissed from this Action. RK Pharma denies any remaining allegations of Paragraph 16.

17. On information and belief, RK Pharma, Inc., itself and/or through VGYAAN, Apicore, and Archis, is in the business of developing, manufacturing, importing, marketing, and/or selling generic pharmaceutical products throughout the United States, including in this Judicial District.

**ANSWER:** RK Pharma itself is in the business of developing, manufacturing, importing, marketing, and/or selling generic pharmaceutical products. RK Pharma denies any remaining allegations of Paragraph 17.

18. On information and belief, and as confirmed by RK Pharma Inc.'s website, "RK Pharma Inc[.] is a group of companies engaged in all phases of the generic pharmaceutical business" consisting of the "vertically integrated" defendants[1]:




Group of Companies

RK Pharma Inc is a group of companies engaged in all phases of the generic pharmaceutical business, with operations in the US and India. Through vertical integration, the RK Pharma group of companies now comprises of India based Apicore Pharmaceuticals Pvt Ltd and Aktinos Pharma; and also a state of the art drug finished dosage form manufacturing facility (former Pfizer manufacturing facility) based in Pearl River , New York, thereby strengthening its manufacturing product capabilities in the US.

In addition, in June 2023, RK Pharma Inc. acquired New Jersey headquartered VGYAAN Pharmaceuticals LLC which added to RK Pharma Inc.'s product portfolio as well as front-end capabilities. Addition of VGYAAN Pharmaceuticals to RK Pharma group of companies adds to our other group company Archis Pharma LLC, the sales and marketing arm, commercializes both the RK Pharma group's and in-licensed partner products.

[1]

**ANSWER:** RK Pharma Inc.'s website includes a statement that "RK Pharma Inc[.] is a group of companies engaged in all phases of the generic pharmaceutical business." To the extent an answer is required, Defendant RK Pharma denies any remaining allegations of Paragraph 18.

19. On information and belief, VGYAAN is the entity within the RK Pharma Group responsible for "development, filing with the regulatory agencies and commercialization" of "generics and 505(b)(2) drugs."[2]

---

[1] About Us. https://rkpharmainc.com/about-us.html
[2] http://vgyaan.com/products/

**ANSWER:** VGYAAN has been dismissed from this Action. To the extent an answer is required, denied.

20. On information and belief, RK Pharma, Inc., VGYAAN, Apicore, and Archis, acting in concert and/or as agents of one another, filed the ANDA with a Paragraph IV Certification for the purpose of seeking approval to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of the generic products described in the ANDA in the United States, including in New Jersey.

**ANSWER:** RK Pharma, Inc. filed the ANDA with a Paragraph IV Certification for the purpose of seeking approval to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of the generic products described in the ANDA. To the extent an answer is required, denied.

21. On information and belief, actions related to the submission of the ANDA with a Paragraph IV Certification occurred in the State of New Jersey, and if the RK Pharma Group receives approval for the ANDA, RK Pharma, Inc., VGYAAN, Apicore, and Archis, acting in concert and/or as agents of one another, will market, distribute, offer for sale, and/or sell the generic products described in the ANDA in the United States, including in New Jersey, and will derive substantial revenue from the use or consumption of the generic products described in the ANDA in the State of New Jersey. *See Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755, 763 (Fed. Cir. 2016).

**ANSWER:** RK Pharma denies the allegations contained in Paragraph 21.

22. On information and belief, if the ANDA with a Paragraph IV Certification is approved, the generic products described in the ANDA would, among other things, be

manufactured, marketed, distributed, offered for sale, and/or sold in New Jersey, prescribed by physicians practicing in New Jersey, dispensed by pharmacies located within New Jersey, and/or used by patients in New Jersey, all of which would have a substantial effect on New Jersey.

**ANSWER:** RK Pharma cannot respond as to its actions should RK Pharma receive approval for the ANDA, as intervening events, including but not limited to competition by others, changes in the marketplace, and FDA actions with respect to the brand product, can affect the actions RK Pharma ultimately undertakes. To the extent an answer is required, the RK Pharma denies the allegations in Paragraph 22.

23. On information and belief, and as confirmed by RK Pharma Inc.'s website, RK Pharma, Inc., VGYAAN, Apicore, and Archis operate through "vertical integration"[3] wherein VGYAAN works to "develop[e] and commercializ[e] clinically critical therapies,"[4] Apicore "is a leading process R&D and API manufacturing service provider,"[5] and "Archis [], the sales and marketing arm, commercializes both the RK Pharma group's and in-licensed partner products." [6]

**ANSWER:** The RK Pharma admits that it is licensed to sell pharmaceutical products. To the extent an answer is required, the RK Pharma denies any remaining allegations of Paragraph 23. The other entities referred to in Paragraph 23 have been dismissed from this Action.

24. On information and belief, VGYAAN, Apicore, and Archis are wholly owned subsidiaries of and operate under common management by RK Pharma, Inc.[7]

**ANSWER:** RK Pharma admits that VGYAAN, Apicore, and Archis are wholly owned

---

[3] *Id.*
[4] About Us, http://vgyaan.com/about/
[5] About Us, https://rkpharmainc.com/about-us.html
[6] *Id.*
[7] *Id.*

subsidiaries of RK Pharma, Inc. RK Pharma denies any remaining allegations of Paragraph 24.

25. On information and belief, following any FDA approval of the ANDA with a Paragraph IV Certification, RK Pharma, Inc., VGYAAN, Apicore, and Archis will work in concert with one another to make, use, offer to sell, and/or sell the ANDA Products throughout the United States, and/or import such generic drug products into the United States, including in this judicial district.

**ANSWER:** RK Pharma cannot respond as to its actions should the FDA approves its ANDA, as intervening events, including but not limited to competition by others, changes in the marketplace, and FDA actions with respect to the brand product, can affect the actions RK Pharma ultimately undertakes. To the extent an answer is required, RK Pharma denies the allegations in Paragraph 25. The other entities referred to in Paragraph 25 have been dismissed from this Action.

26. On information and belief, the RK Pharma Group derives substantial revenue from the marketing, manufacture, and/or sale of generic pharmaceutical products in the United States and New Jersey.

**ANSWER:** RK Pharma derives revenue from the marketing, manufacture, and/or sale of generic pharmaceutical products. RK Pharma denies any remaining allegations of Paragraph 26. To the extent "RK Pharma Group" refers to VGYAAN, Apicore, and Archis, these entities have been dismissed from this Action.

## BACKGROUND

27. ARI holds New Drug Application ("NDA") No. 209376 for Tralement® (trace elements injection 4*, USP) and Multrys® (trace elements injection 4*, USP), which were approved by FDA on July 2, 2020, and which ARI manufactures and sells in this judicial district

and throughout the United States.

**ANSWER:** On information and belief, ARI holds New Drug Application ("NDA") No. 209376 for Tralement® (trace elements injection 4*, USP) and Multrys® (trace elements injection 4*, USP), which were approved by FDA on July 2, 2020. Defendant is otherwise without knowledge or information sufficient to form a belief as to the truth of the other allegations of Paragraph 27, therefore denies them.

28. Tralement® is the first and only FDA-approved multi-trace element injection for patients weighing at least 10 kg. FDA has approved both 1 mL and 5 mL forms of Tralement®; ARI markets a 1 mL Tralement® product.

**ANSWER:** Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 28, therefore denies them.

29. Tralement® is a combination of trace elements (zinc sulfate, cupric sulfate, manganese sulfate and selenious acid) indicated in adult and pediatric patients weighing at least 10 kg as a source of zinc, copper, manganese, and selenium for parenteral nutrition when oral or enteral nutrition is not possible, insufficient, or contraindicated.

**ANSWER:** Defendant directs Plaintiff to the FDA-approved labeling for the current formulations of Tralement®. Defendant is otherwise without knowledge or information sufficient to form a belief as to the truth of the other allegations in Paragraph 29, therefore denies them.

30. Multrys® is the first and only FDA-approved multi-trace element injection for neonatal and pediatric patients weighing less than 10 kg.

**ANSWER:** Defendant is without knowledge or information sufficient to form a belief as to

the truth of the allegations of Paragraph 30, therefore denies them.

31. Multrys® is a combination of trace elements (zinc sulfate, cupric sulfate, manganese sulfate, and selenious acid) indicated in neonatal and pediatric patients weighing less than 10 kg as a source of zinc, copper, manganese, and selenium for parenteral nutrition when oral or enteral nutrition is not possible, insufficient, or contraindicated.

**ANSWER:** Defendant directs Plaintiff to the FDA-approved labeling for the current formulations of Multrys®. Defendant is otherwise without knowledge or information sufficient to form a belief as to the truth of the other allegations of Paragraph 31, therefore denies them.

32. Both Tralement® and Multrys® are commercial embodiments of the ’548 patent.

**ANSWER:** Defendant directs Plaintiff to the FDA-approved labeling for the current formulations of both Tralement® and Multrys®. Defendant is otherwise without knowledge or information sufficient to form a belief as to the truth of the other allegations of Paragraph 32, therefore denies them.

33. ARI is the owner of the ’548 patent, which is entitled “Trace element compositions, methods of making and use” was duly and legally issued on October 17, 2023. A copy of the ’548 patent is attached as Exhibit 1.

**ANSWER:** Defendant admits that Exhibit 1 to Plaintiff’s Complaint contains what purports to be a copy of the ’548 patent, which purported copy bears the title “Trace Element Compositions, Methods of Making and Use.” Defendant denies that the ’548 patent was “duly and lawfully issued” and deny any remaining allegations in Paragraph 33.

34. The ’548 patent has been listed in connection with Tralement® and Multrys® in

FDA's publication Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book").

**ANSWER:** On information and belief, the '548 patent has been listed in connection with Tralement® and Multrys® in FDA's publication Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book").

35. As indicated in the Orange Book, the patent expiration date for the '548 patent is July 1, 2041.

**ANSWER:** On information and belief, the information Plaintiff caused to be listed on the Orange Book indicates that the patent expiration date for the '548 patent is July 1, 2041. RK Pharma denies the remaining allegations in Paragraph 35.

36. On information and belief, RK Pharma, Inc., VGYAAN, Apicore, and Archis were all responsible for preparing and submitting the ANDA with a Paragraph IV Certification.

**ANSWER:** Denied.

37. By letter dated January 23, 2024 ("the Notice Letter"), RK Pharma, Inc. notified ARI pursuant to the Federal Food, Drug, and Cosmetic Act ("FDCA") that RK Pharma, Inc. had submitted the ANDA with a Paragraph IV Certification to FDA to seek approval to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of the ANDA Products prior to the expiration of the '548 patent.

**ANSWER:** Admitted.

38. On information and belief, RK Pharma, Inc., VGYAAN, Apicore, and Archis submitted the ANDA to FDA with RK Pharma, Inc. as the named applicant, which contained a

Paragraph IV Certification asserting that the ’548 patent will not be infringed by the manufacture, use, offer for sale, sale, or importation of the ANDA Products, or alternatively, that the ’548 patent is invalid.

**ANSWER:** RK Pharma, Inc. admits that it was the named applicant and submitted the ANDA to FDA which contained a Paragraph IV Certification asserting that the ’548 patent will not be infringed by the manufacture, use, offer for sale, sale, or importation of the ANDA Products, or alternatively, that the ’548 patent is invalid. RK Pharma denies the remaining allegations in Paragraph 38.

39. The Notice Letter asserted defenses of non-infringement for certain, but not all, claims of the ’548 patent. The Notice Letter did not set forth positions of non-infringement for Claims 1-2, 4-6, 9-19, 21-43, and 46-56.

**ANSWER:** The Notice Letter asserted defenses of non-infringement. RK Pharma denies the remaining allegations in Paragraph 39.

40. The Notice Letter contained an offer of confidential access (“OCA”) to the ANDA; however, the proposed OCA contained unreasonable restrictions and the RK Pharma Group refused to negotiate any terms of the OCA with ARI. Consequently, ARI was unable to access the ANDA to assess any claims of non-infringement for the ’548 patent prior to the filing of this Complaint.

**ANSWER:** RK Pharma directs Plaintiff to the Notice Letter itself and denies the characterization of the offer of confidential access in Paragraph 40. RK Pharma denies that “ARI was unable to access the ANDA.” RK Pharma denies any remaining allegations in Paragraph 40.

41. On information and belief, the ANDA Products are generic versions of Tralement®

(trace elements injection 4*, USP) and Multrys® (trace elements injection 4*, USP), as their reference listed drugs, containing the same or equivalent ingredients in the same or equivalent amounts.

**ANSWER:** Defendant directs Plaintiff to the FDA-approved labeling for the current formulations of the product. Defendant is otherwise without knowledge or information sufficient to form a belief as to the truth of the other allegations of Paragraph 41.

42. In the Notice Letter, the RK Pharma Group disclosed that the ANDA Products are (1) a single-dose, 1 mL generic version of Tralement® containing 3 mg of zinc, 0.3 mg of copper, 55 mcg of manganese, and 60 mcg of selenium; (2) a 5 mL Pharmacy Bulk Package generic version of Tralement® containing 3 mg of zinc, 0.3 mg of copper, 55 mcg of manganese, and 60 mcg of selenium; and (3) a generic version of Multrys® containing 1000 mcg of zinc, 60 mcg of copper, 3 mcg of manganese, and 6 mcg of selenium.

**ANSWER:** RK Pharma directs Plaintiff to the Notice Letter for the best description of the ANDA Products.

43. On information and belief, the ANDA Products contain zinc, copper, manganese, and selenium in the same or equivalent amounts as Tralement® and Multrys®, respectively.

**ANSWER:** RK Pharma directs Plaintiff to the Notice Letter for the best description of the ANDA Products.

44. On information and belief, the ANDA Products will feature the same or equivalent chemical properties as Tralement® and Multrys®.

**ANSWER:** RK Pharma directs Plaintiff to the Notice Letter for the best description of the

ANDA Products.

**COUNT I: INFRINGEMENT OF THE ’548 PATENT**

45. ARI realleges paragraphs 1-44 as if fully set forth herein.

**ANSWER:** Defendant repeats, reiterates and re-alleges their responses to paragraphs 1 through and including 44 of the Complaint with the same force and effect as if hereinafter set forth at length.

46. The RK Pharma Group’s submission of the ANDA with a Paragraph IV Certification to obtain approval to engage in the commercial manufacture, use, offer for sale, sale and/or importation of the ANDA Products in or into the United States, prior to the expiration of the ’548 patent, constitutes direct and indirect infringement of the ’548 patent pursuant to 35 U.S.C. § 271(e)(2)(A), either literally or under the doctrine of equivalents.

**ANSWER:** Denied.

47. On information and belief, the ANDA Products, if approved by FDA, will be manufactured, used, offered for sale, sold, and/or imported in or into the United States by the RK Pharma Group or on its behalf, and will be administered by patients and/or medical practitioners in the United States according to the directions and instructions in the proposed package insert, which will constitute direct infringement by patients and/or medical practitioners of one or more claims of the ’548 patent, under 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents. On information and belief, the administration of the ANDA Products will occur with the RK Pharma Group’s specific intent and encouragement and will be conduct that the RK Pharma Group knows or should know will occur. On information and belief, the RK Pharma Group will actively induce, encourage, aid, and abet that conduct by patients and/or medical practitioners, with knowledge and

specific intent that the conduct will be in contravention of ARI's rights under the '548 patent.

**ANSWER:** RK Pharma cannot respond as to its actions should the FDA approve its ANDA, as intervening events, including but not limited to competition by others, changes in the marketplace, and FDA actions with respect to the brand product, can affect the actions RK Pharma ultimately undertakes. RK Pharma denies the allegations of Paragraph 47.

48. On information and belief, the RK Pharma Group's manufacturing, use, offer for sale, sale, and/or importation of the ANDA Products, once the ANDA with a Paragraph IV Certification is approved by FDA, would constitute direct infringement under 35 U.S.C. § 271(a), induced infringement under 35 U.S.C. § 271(b), and contributory infringement under 35 U.S.C. § 271(c) of one or more claims of the '548 patent, either literally or under the doctrine of equivalents. On information and belief, the RK Pharma Group intends that the ANDA Products be used by patients and medical professionals. Also, on information and belief, the RK Pharma Group knows that the ANDA Products are especially made or adapted for use in infringing the '548 patent, and that the ANDA Products are not suitable for substantial non-infringing use.

**ANSWER:** RK Pharma cannot respond as to its actions should the FDA approve its ANDA, as intervening events, including but not limited to competition by others, changes in the marketplace, and FDA actions with respect to the brand product, can affect the actions the RK Pharma ultimately undertakes. RK Pharma denies the allegations of Paragraph 48.

49. ARI will be irreparably harmed if the RK Pharma Group is permitted to make, use, sell, offer to sell, and/or import the ANDA Products in or into the United States, and is not enjoined from doing so. ARI is entitled to relief provided by 35 U.S.C. §§ 271(e)(4) and/or 283, including an order of this Court that the effective date of approval of the ANDA be a date that is not earlier than the expiration date of the '548 patent, or any later expiration of exclusivity for the '548 patent to

which ARI is or becomes entitled, and an injunction against such infringement. ARI does not have an adequate remedy at law.

**ANSWER:** Paragraph 49 sets forth legal conclusions based on alleged activities to which no response is required. To the extent an answer is required, RK Pharma denies the allegations of Paragraph 49.

50. The RK Pharma Group has had knowledge of the ’548 patent since at least the date the RK Pharma Group submitted the ANDA with a Paragraph IV Certification and was aware that submission of the ANDA with a Paragraph IV Certification constituted an act of infringement under 35 U.S.C. § 271(e)(2).

**ANSWER:** Paragraph 50 sets forth legal conclusions based on alleged activities to which no response is required. To the extent an answer is required, RK Pharma denies the allegations of Paragraph 50.

51. This case is “exceptional,” and ARI is entitled to an award of reasonable attorneys’ fees under 35 U.S.C. § 285.

**ANSWER:** Paragraph 51 sets forth legal conclusions based on alleged activities to which no response is required. To the extent an answer is required, Defendant denies the allegations of Paragraph 51.

## PRAYER FOR RELIEF

WHEREFORE, ARI prays that this Court grant the following relief:

(a) A judgment under 35 U.S.C. § 271(e)(2)(A) that the RK Pharma Group has infringed at least one claim of the ’548 patent through the RK Pharma Group’s submission of the ANDA with a Paragraph IV Certification to FDA seeking approval to commercially manufacture,

use, offer for sale, sell, and/or import within or into the United States the ANDA Products before the expiration of the ’548 patent;

**ANSWER:** Defendant RK Pharma denies that Plaintiff is entitled to any of its requests for relief. As previously stated, other Defendants have been dismissed from this Action.

(b) A judgment under 35 U.S.C. §§ 271(a), (b), and/or (c) that the RK Pharma Group’s commercial manufacture, use, offer for sale, sale, and/or importation within or into the United States of the ANDA Products before the expiration of the ’548 patent will infringe, actively induce infringement, and/or contribute to the infringement of at least one claim of the ’548 patent;

**ANSWER:** Defendant RK Pharma denies that Plaintiff is entitled to any of its requests for relief. As previously stated, other Defendants have been dismissed from this Action.

(c) An order pursuant to 35 U.S.C. § 271(e)(4)(A) providing that the effective date of any FDA approval of the ANDA, shall not be earlier than the latest expiration date of the ’548 patent, including any extensions and/or additional periods of exclusivity to which ARI is or becomes entitled.

**ANSWER:** Defendant RK Pharma denies that Plaintiff is entitled to any of its requests for relief. As previously stated, other Defendants have been dismissed from this Action.

(d) The entry of a permanent and/or preliminary injunction enjoining the RK Pharma Group, and its affiliates and subsidiaries, and each of their officers, agents, servants, and employees, from making, having made, using, offering to sell, selling, marketing, distributing, and importing in or into the United States the ANDA Products, or any product that infringes the ’548 patent, or inducing or contributing to the infringement of the ’548 patent until after the expiration date of the ’548 patent, including any extension and/or additional periods of exclusivity to which

ARI is or becomes entitled, in accordance with 35 U.S.C. §§ 271(e)(4)(B) and 283;

**ANSWER:** Defendant RK Pharma denies that Plaintiff is entitled to any of its requests for relief. As previously stated, other Defendants have been dismissed from this Action.

(e) The entry of a permanent and/or preliminary injunction enjoining the RK Pharma Group, and its affiliates and subsidiaries, and each of their officers, agents, servants, and employees, from seeking, obtaining, or maintaining approval of the ANDA until the expiration of the ’548 patent, in accordance with 35 U.S.C. §§ 271(e)(4)(B) and 283;

**ANSWER:** Defendant RK Pharma denies that Plaintiff is entitled to any of its requests for relief. As previously stated, other Defendants have been dismissed from this Action.

(f) Damages or other monetary relief to ARI if the RK Pharma Group engages in commercial manufacture, use, offers to sell, sale, and/or importation in or into the United States of the ANDA Products prior to the expiration of the ’548 patent, including any extensions and/or additional periods of exclusivity to which ARI is or becomes entitled;

**ANSWER:** Defendant RK Pharma denies that Plaintiff is entitled to any of its requests for relief. As previously stated, other Defendants have been dismissed from this Action.

(g) A finding that this is an exceptional case pursuant to 35 U.S.C. § 285 and awarding ARI its attorney’s fees incurred in this action; and

**ANSWER:** Defendant RK Pharma denies that Plaintiff is entitled to any of its requests for relief. As previously stated, other Defendants have been dismissed from this Action.

(h) Such further relief as this Court deems proper and just.

**ANSWER:** Defendant RK Pharma denies that Plaintiff is entitled to any of its requests for relief. As previously stated, other Defendants have been dismissed from this Action.

**ADDITIONAL DEFENSES**

Defendant RK Pharma, Inc. asserts the following defenses without prejudice to the denials in this Answer, without admitting any allegations of this Complaint not otherwise admitted.

**FIRST ADDITIONAL DEFENSE**
**FAILURE TO STATE A CLAIM**

Plaintiff's Complaint, in whole or in part, fails to state claims upon which relief may be granted.

**SECOND ADDITIONAL DEFENSE**
**INVALIDITY AND UNENFORCEABILITY**

U.S. Patent Nos. 11,786,548 ("the '548 patent") ("the patent-in-suit"), and each of the claims thereof, is invalid and/or unenforceable for failure to comply with one or more conditions for patentability and/or enforceability set forth in one or more provisions of 35 U.S.C. §§ 101, 102, 103, and/or 112, or under other judicially-created bases for invalidity and/or unenforceability.

**THIRD ADDITIONAL DEFENSE**
**NO DIRECT INFRINGEMENT**

Defendant has not, does not, and will not directly infringe literally or under the doctrine of equivalents any valid and enforceable claim of the patent-in-suit.

**FOURTH ADDITIONAL DEFENSE**
**NO INDIRECT INFRINGEMENT**

Defendant has not, does not, and will not induce the infringement of, or contribute to the infringement of, any valid and enforceable claim of the patent-in-suit, and the manufacturing, marketing, sale, offer for sale, importation, and/or distribution of the ANDA Products do not induce the infringement of, or contribute to the infringement of, any valid and enforceable claim of the patent-in-suit.

**FIFTH ADDITIONAL DEFENSE**
**NO COSTS**

Plaintiff is barred by 35 U.S.C. § 288 from recovering any costs.

**SIXTH ADDITIONAL DEFENSE**
**FAILURE TO STATE CLAIM OF WILFULNESS**

Plaintiff fails to state a proper claim for willful infringement or exceptional case under 35 U.S.C. §§ 271(e)(4) and 285, or otherwise.

**SEVENTH ADDITIONAL DEFENSE**
**INEQUITABLE CONDUCT**

The patent-in-suit is unenforceable for inequitable conduct.

**EIGHTH ADDITIONAL DEFENSE**
**RESERVATION OF RIGHTS**

Defendant reserves the right to assert additional defenses or counterclaims that discovery may reveal.

## COUNTERCLAIMS OF DEFENDANT

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Defendant RK Pharma, Inc. ("RK Pharma" or "Counterclaim-Plaintiff"), by and through its counsel, for its Counterclaims against Plaintiff American Regent, Inc. ("ARI" or "Counterclaim-Defendant") hereby states the following:

1. Counterclaim-Plaintiff repeats and incorporates by reference each of the foregoing paragraphs of its Answer and Additional Defenses to the Complaint. Counterclaim-Plaintiff repeats and incorporates by reference each of the foregoing paragraphs of Defendant's Answer and Additional Defenses to the Complaint.

2. This is an action for a declaratory judgment of non-infringement and invalidity and/or unenforceability of the claims of U.S. Patent No 11,786,548 ("the '548 patent") ("the patent-in-suit").

3. On information and belief, a true and correct copy of the '548 patent is attached to the Complaint as Exhibit 1.

## THE PARTIES

4. Counterclaim-Plaintiff RK Pharma, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 401 N. Middletown Road, Building 215/215A, Pearl River, New York 10965 and a regular and established place of business at 23 Orchard Road, Suite 180, Skillman, New Jersey 08558.

5. On information and belief, and based upon the Complaint filed, Counterclaim-Defendant is a corporation organized and existing under the laws of the State of New York, with a principal place of business at 5 Ramsey Road, Shirley, New York 11967.

## JURISDICTION

6. This Court has subject matter jurisdiction over these Counterclaims for declaratory judgment pursuant to 28 U.S.C. §§ 1331, 1337(a), 1338(a), 2201(a) and (b), and 2202, based on an actual controversy between Counterclaim-Plaintiffs, on the one hand, and the Counterclaim-Defendant on the other hand, arising under the Patent Laws of the United States, 35 U.S.C. § 1 et seq.

7. This Court has personal jurisdiction over Counterclaim-Defendant based, inter alia, on the filing by Counterclaim-Defendant of this lawsuit in this jurisdiction and because Counterclaim-Defendant is doing business in this jurisdiction.

8. Venue is proper in this district over Counterclaim-Defendant based, inter alia, on the filing by Counterclaim- Defendant of this lawsuit in this jurisdiction and because Counterclaim-Defendant is doing business in this jurisdiction.

## ORANGE BOOK PATENT LISTING

9. The Hatch-Waxman Amendments to the Food, Drug and Cosmetic Act require NDA holders to disclose to the FDA the patent numbers and expiration dates of those patents that the holder believes claim the "drug" for which their NDA is submitted, or patents covering a "method of using such drug." 21 U.S.C. §§ 355(b)(1) and (c)(2).

10. On information and belief, New Drug Application ("NDA") No. 209376 for Tralement® (trace elements injection 4*, USP) and Multrys® (trace elements injection 4*, USP) was approved by the FDA on July 2, 2020.

11. On information and belief, pursuant to 21 U.S.C. §§ 355(b)(l), Counterclaim-Defendant caused the FDA to list the patent-in-suit in the Orange Book in connection with New Drug Application ("NDA") No. 209376 for Tralement® (trace elements injection 4*, USP) and

Multrys® (trace elements injection 4*, USP).

12. By maintaining the listings of the patent-in-suit in the Orange Book, Counterclaim-Defendant represented to the world that the patent-in-suit could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale (21 U.S.C. § 355(b)(l)) of the respective brand name product before the expiration of the patent-in-suit.

**ABBREVIATED NEW DRUG APPLICATION**

13. RK Pharma filed ANDA No. 218537 ("the ANDA") with the FDA seeking approval to market use, or sale of generic versions of ARI's Tralement® (trace elements injection 4*, USP) in 1 mL single-dose vials and 5 mL Pharmacy Bulk Package vials and Multrys® (trace elements injection 4*, USP) drug products ("the ANDA Products"). The ANDA included a Paragraph IV Certification, certifying that to the best of RK Pharma's knowledge that all of the claims of the patent-in-suit are invalid, unenforceable, and/or will not be infringed by the manufacture, use, sale, offer to sell, and/or importation of the ANDA Products.

**THE PRESENCE OF A CASE OR CONTROVERSY**

14. By maintaining the Orange Book listing of the patent-in-suit in connection with the NDA, Counterclaim-Defendant represented that the patent-in-suit could reasonably be asserted against anyone making, using, or selling the ANDA Products, without a license from the Counterclaim-Defendant prior to the expiration of the patent-in-suit.

15. Counterclaim-Defendant has filed an infringement action under Title 35, United States Code, Sections 100 et seq., asserting the patent-in-suit against Counterclaim-Plaintiff and seeking a declaration of infringement regarding the patent-in-suit. There has been, and is now, an actual and justiciable controversy between Counterclaim-Plaintiff on the one hand, and Counterclaim-Defendant, on the other hand, as to whether the ANDA Products infringe the patent-in-suit, and whether any valid, enforceable claim in the patent-in-suit exists.

16. Counterclaim-Plaintiff seeks to market the ANDA Product in the United States prior to the expiration of the patent-in-suit.

17. If Counterclaim-Plaintiff succeeds in proving that the ANDA Products do not infringe the patent-in-suit or all asserted claims are invalid or unenforceable, and thus non-infringing, such a judgment will remove any uncertainty that may exist by virtue of Counterclaim-Defendant's maintenance of the patent-in-suit in the Orange Book in connection with the NDA.

18. In light of all the circumstances, an actual substantial and continuing justiciable controversy having sufficient immediacy and reality to warrant the issuance of a declaration of rights by the Court exists between Counterclaim-Defendant and Counterclaim-Plaintiff as to whether the claims of the patent-in-suit are invalid and/or not infringed by Counterclaim-Plaintiffs.

**COUNT I**

**DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE PATENT-IN-SUIT**

19. Counterclaim-Plaintiff repeats and incorporates by reference Paragraphs 1-18 of its Counterclaims, above, as if fully set forth herein.

20. This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. A case of actual, substantial, and continuing justiciable controversy having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaration of rights by this Court exists between Counterclaim-Plaintiff and Counterclaim-Defendant concerning the patent-in-suit and the claims of the patent-in-suit.

21. Counterclaim-Defendant alleges that the commercial manufacture, use, offer for sale, sale, and/or importation of ANDA Products infringe one or more claims of the patent-in-

suit.

22. Counterclaim-Plaintiff asserts that no valid and enforceable claim of the patent-in-suit is infringed by the manufacture, use, offer for sale, sale, and/or importation of the ANDA Products.

23. Counterclaim-Plaintiff is entitled to a declaration that the manufacture, use, offer for sale, sale, and/or importation of the ANDA Products do not infringe any valid claim of the patent-in-suit.

**COUNT II**

**DECLARATORY JUDGMENT OF INVALIDITY OF THE PATENT-IN-SUIT**

24. Counterclaim-Plaintiff repeats and incorporates by reference Paragraphs 1-23 of Counterclaim-Plaintiff's Counterclaims, above, as if fully set forth herein.

25. This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. A case of actual, substantial, and continuing justiciable controversy having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaration of rights by this Court exists between Counterclaim-Plaintiff and Counterclaim-Defendant concerning the claims of the patent-in-suit.

26. Counterclaim-Defendant alleges that the commercial manufacture, use, offer for sale, sale, and/or importation of the ANDA Products infringe one or more claims of the patent-in-suit.

27. Counterclaim-Plaintiff asserts that the manufacture, use, offer-for-sale, sale, and/or importation of the ANDA Products do not infringe any valid and enforceable claim of the patent-in-suit, and that the claims of the patent-in-suit are invalid under one or more provisions of 35 U.S.C. §§ 101, 102, 103, or 112, or other judicially-created bases for invalidation and/or unenforceability,

including but not limited to all the reasons set forth in the Notice Letter and its Detailed Statement, which are incorporated herein.

28. Counterclaim-Plaintiff is entitled to a declaration that the claims of the patent-in-suit are invalid under one or more provisions of 35 U.S.C. §§ 101, 102, 103, or 112, or other judicially created bases for invalidation and/or unenforceability.

**COUNT III**

**DECLARATORY JUDGMENT OF UNENFORCEABILITY OF THE PATENT-IN-SUIT FOR INEQUITABLE CONDUCT**

29. Counterclaim-Plaintiff repeats and incorporates by reference Paragraphs 1-28 of Counterclaim-Plaintiff's Counterclaims, above, as if fully set forth herein.

30. This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. A case of actual, substantial, and continuing justiciable controversy having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaration of rights by this Court exists between Counterclaim-Plaintiff and Counterclaim-Defendant concerning the patent-in-suit and the claims of the patent-in-suit.

31. Counterclaim-Defendant alleges that the commercial manufacture, use, offer for sale, sale, and/or importation of ANDA Products infringe one or more claims of the patent-in-suit.

32. Counterclaim-Plaintiff asserts that the manufacture, use, offer-for-sale, sale, and/or importation of the ANDA Products do not infringe any valid and enforceable claim of the patent-in-suit, and that the claims of the patent-in-suit are invalid and unenforceable because of inequitable conduct including intent to deceive the Patent Office by the named inventors, prosecuting attorneys, agents or firm, declarants, Plaintiff/Counterclaim-Defendant American Regent, Inc., and/or any

other party or parties substantially involved in the prosecution of the patent-in-suit (collectively, "the applicants").

**The Patent-in-Suit**

33. The patent-in-suit claims priority to Provisional Application No. 63/047,708 ("the '708 application") filed on July 2, 2020.

34. The patent-in-suit issued on October 17, 2023, from Application Serial No. 17/365,695 ("the '695 application"), filed on or about July 1, 2021.

35. On information and belief, the specification of the '695 application is substantively identical to the specification of the '708 application.

36. The entire file history of the patent-in-suit is incorporated by reference herein.

37. The patent-in-suit lists three (3) inventors, namely, Gopal Anyarambhatla, Richard Lawrence, and Jasmina Marinkovic.

38. The patent-in-suit lists Ali Soroush ("Soroush") as "Primary Examiner." Soroush was also the primary examiner during the prosecution of the '695 application.

39. The patent-in-suit lists "Sorell, Lenna & Schmidt, LLP" as "Attorney, Agent, or Firm."

40. The patent-in-suit generally relates to the subject matter of injectable compositions that can be added to parenteral nutrition.

41. The '695 application was assigned to American Regent, Inc. on or about July 12, 2021. The assignment was recorded at Reel/Frame 057731/0549 on October 7, 2021.

42. During the prosecution of the '695 application, the applicants buried material prior art and failed to disclose material information, amounting to inequitable conduct and intent to deceive the Patent Office.

43. The inequitable conduct and intent to deceive the Patent Office renders the patent-in-suit unenforceable.

**Prosecution History of the Patent-in-Suit**

44. On or about July 1, 2021, William D. Schmidt, Reg. No. 39,492 of Sorell, Lenna & Schmidt, LLP, ("Schmidt"), submitted a non-provisional utility patent application, the '695 application to the Patent Office. The '695 application claims priority to the '708 application and led to the issuance of the patent-in-suit.

45. Following the filing of the '695 application, each of the inventors executed a Declaration pursuant to 37 C.F.R. § 1.63, which acknowledged the inventors' duty to disclose "all information known to us to be material to patentability." The Declarations were submitted to the Patent Office on or about October 10, 2021, and are part of the prosecution history file of the patent-in-suit.

46. To meet their duty to disclose "all information known to us to be material to patentability," during the time period between February 25, 2022, and September 8, 2023, the applicants submitted to the Patent Office about 8 separate information disclosure statements (IDSs) of patent and non-patent literature.

47. In an office action mailed on February 25, 2022, the examiner rejected all pending claims as being anticipated by Chang et al. (U.S. Patent Application Publication 2015/0238527 A1, Published 08/27/2015) ("Chang").

48. The examiner noted that Chang teaches "a vitamin supplement composition for injection (title). A preferred composition comprises 1 mg (1000 g /0.39%) zinc, sterile water, optionally comprising a preservative such as benzyl alcohol for a total of a 1ml formulation (paragraphs 0223-0224). The benzyl alcohol can be present in an amount of 0.01-2% of the

composition (paragraph 0222). The composition is injected twice a day for 29 days (paragraph 0226). The composition does not comprise any amount of chromium, iodine, fluoride, aluminum, silicone, magnesium, calcium, boron, or cadmium." The examiner also noted that "Chang et al. lacks a preferred embodiment comprising 0.9% benzyl alcohol."

49. In the same office action, the examiner rejected the pending claims as being unpatentable over Fahim (U.S. Patent No. 4,339,438, published 7/13/1982) ("Fahim").

50. The examiner noted that "Fahim teaches a sterile injectable solution comprising g5 (5,000 µg) to 125mg of zinc sulfate heptahydrate being buffered to a pH of 4.0-6.5 (prior art claim 1). The composition does not comprise any amount of chromium, iodine, fluoride, aluminum, silicone, magnesium, calcium, boron, or cadmium. Therefore, the instant claims are anticipated by the prior art." The examiner further noted that "Fahim does not anticipate a composition comprising the claimed amount of zinc nor does it anticipate the instantly claimed pH. However, Fahim does render such a composition obvious."

51. In the same office action, the examiner rejected the pending claims as being unpatentable over Matsushita et al. (Japanese Patent Application 2000178181, published 06/27/2000) ("Matsushita").

52. The examiner noted that Matsushita teaches "an aqueous solution comprising zinc sulfate heptahydrate, copper sulfate pentahydrate, selenium acid, manganese chloride tetrahydrate, and water for injection; wherein solutions pH is adjusted with sodium hydroxide to 4.0, 5.0, or 6.0. The composition does not comprise any amount of chromium, iodine, fluoride, aluminum, silicone, magnesium, calcium, boron, or cadmium."

53. In the same office action, the examiner rejected the pending claims as being unpatentable over Chang and further in view of Gray (U.S. Patent No. 7,077,826 B1, published 07/18/2006) ("Grey").

54. The examiner noted that Chang lacks a teaching wherein the composition is in a multi-dose vial. The examiner also noted that Gray teaches multi-dose syringes containing injectable medications such as trace elements.

55. In the same office action, the examiner rejected claim 16 as being unpatentable over Chang and further in view of Laurie et al. (U.S. Patent No. 7,285,292 B2, Published 10/23/2007) ("Laurie").

56. The examiner noted that Chang lacks teaching wherein the composition comprises chromium. The examiner also noted that Laurie teaches an injectable trace element composition comprising chromium (prior art claim 11) and that it would have been obvious to combine.

57. On May 10, 2002, the examiner had a telephonic interview with the applicants. On May 17, 2023, the examiner issued an interview summary record noting that the applicants proposed certain amendments and that no agreement was reached on patentable subject matter.

58. On May 25, 2002, the applicants filed an amendment in response to the office action mailed on February 25, 2022, amending the pending claims, adding a new claim and arguing against the rejections.

59. In an office action mailed July 7, 2002, the examiner rejected the amended claims as being anticipated by Drugs.com (Multitrace-5, Published 09/07/2015) as evidenced by Americanregent.com (Multitrace 5 Concentrate (Trace Elements Injection 5, USP), Multitrace 5 (Trace Elements Injection 5, USP) Safety Data Sheet, Published 01/09/2019).

60. In the same office action, the examiner rejected the pending claims as being unpatentable over Drugs.com (Multitrace-5, Published 09/07/2015) as evidenced by American regent.com (Multitrace 5 Concentrate (Trace Elements Injection 5, USP), Multitrace 5 (Trace Elements Injection 5, USP) Safety Data Sheet, Published 01/09/2019).

61. The examiner noted that Drugs.com teaches that "Multitrace-5 is a sterile

nonpyrogenic solution trace element injection for total parenteral nutrition. Each ml comprises 1000µg zinc, 400µg copper, 100µg manganese, 4µg chromium, 20µg selenium, 0.9% benzyl alcohol preservative, sulfuric acid and/or sodium hydroxide for pH adjustment, and water for injection in 10ml multiple dose vial. The ingredients are zinc sulfate hepta hydrate, cupric sulfate, manganese sulfate, chromic chloride, selenious acid, benzoyl alcohol, sulfuric acid, sodium hydroxide, and water. The suggested dosage level of zinc is 2.5-4 mg/day or 100µg/kg/day for children, of copper 0.5-5 mg/day or 20µg/kg/day for pediatric patients, of manganese 01.15-0.8mg/day or 2-10µg/kg/day for pediatric patients, of chromium 10-15µg/day or 01.14-0.20 µg/kg/day for pediatric patients, and of selenium 20- 40µg/day or 3µg/kg/day."

62. The examiner also noted that Americanregent.com teaches Multitrace-5 has water content of 96.3-98.5% and zinc sulfate heptahydrate of 0.4-2.2%. Americanregent.com further teaches Multitrace-5 has a pH 1.5-3.5.

63. On September 29, 2002, the examiner had a telephonic interview with the applicants, and on October 5, 2022, the examiner issued an interview summary record noting the applicants proposed amending the claims to include the limitation that the composition comprise 0µg of chromium or 1µg/ml or less of chromium and that such amendments would be sufficient to overcome the § 102 rejections of record in the Office Action mailed on July 7, 2022. The examiner suggested that the applicant provide arguments and evidence why it would not have been obvious to adjust the amount of chromium to the amount in the purposed amendment.

64. On October 7, 2002, the applicants submitted an amendment and filed a continuation prosecution application. The applicants amended the claims, added a new claim and argued against the rejections of the office action mailed on July 7, 2022.

65. In an office action mailed on October 26, 2022, the examiner withdrew the rejection of the pending claims as being anticipated by Drugs.com (Multitrace-5, Published 09/07/2015) as

evidenced by Americanregent.com (Multitrace 5 Concentrate (Trace Elements Injection 5, USP), Multitrace 5 (Trace Elements Injection 5, USP) Safety Data Sheet, Published 01/09/2019).

66. In the same office action, the examiner rejected the pending claims as being unpatentable over Drugs.com (Multitrace-5, Published 09/07/2015) as evidenced by American regent.com (Multitrace 5 Concentrate (Trace Elements Injection 5, USP), Multitrace 5 (Trace Elements Injection 5, USP) Safety Data Sheet, Published 01/09/2019).

67. In the same office action, the examiner rejected the pending claims as being unpatentable over Drugs.com (Multitrace-5, Published 09/07/2015) as evidenced by American regent.com (Multitrace 5 Concentrate (Trace Elements Injection 5, USP), Multitrace 5 (Trace Elements Injection 5, USP) Safety Data Sheet, Published 01/09/2019) in view of Burjonrappa et al. (Role of trace elements in parenteral nutrition support of the surgical neonate, Published 2012) ("Burjonrappa").

68. The examiner noted that Burjonrappa teaches that "preterm infant receiving parenteral Cr exhibited poorer glucose tolerance, leading some experts to question its metabolic role in the neonatal population and the actual need for supplementation in neonates. Chromium may also be associated with TPN-related nephropathy, with Cr supplementation for as little as 3 weeks causing reductions in glomerular filtration rate and elevations in serum creatinine ... This has led some experts to recommend a reduction in Cr supplementation in parenteral formulas to avoid toxicity. Chromium supplementation should be discontinued in infants with renal insufficiency."

69. On January 19, 2023, the examiner had a telephonic interview with the applicants, and on January 25, 2023, the examiner issued an interview summary record noting that the applicants discussed that that instant concentrations are not simply routine optimizations of multi-trace element formulation. The examiner indicated that absent a showing of criticality the amounts would have been obvious through routine optimization. The applicants also discussed providing

evidence and/or affidavits showing secondary consideration that the instant claims are non-obvious.

70. On April 26, 2023, the applicants submitted an amendment and submitted under 37 C.F.R. §1.132 of the declaration of Dr. Joseph Boullata (the "Boullata Declaration"), the declaration of Dr. Roshan James (the "James Declaration"), and the declaration of Joann Gioia (the "Gioia Declaration").

71. In notices of allowability mailed on May 24, 2023, June 7, 2023, September 7, 2023 and September 22, 2023, the examiner allowed the claims of the patent-in-suit with the statement of the reasons for allowance that "Applicant's showing of unexpected data, wherein the absence of chromium in a trace element composition result in a composition having considerably less silicon impurities when compared to a trace element composition comprising chromium."

**<u>Inequitable Conduct and Intent to Deceive the Patent Office:</u>**
**<u>Burying of Material Prior Art</u>**

72. During the prosecution of the '695 application, during the period between February 25, 2022, and September 8, 2023, the applicants submitted to the Patent Office on or about October 14, 2021, November 17, 2021, May 25, 2022, June 2, 2022, June 15 2022, October 7, 2022, December 30, 2022, and April 26, 2023, about 8 separate information disclosure statements (IDSs) of patent and non-patent literature.

73. A conservative estimate is that the file history comprises 8,000+ pages.

74. Of the non-patent literature submitted, none of the literature references were submitted in PDF/Optical Character Recognition (OCR) form that would allow word-searching of the text of the PDF.

75. On information and belief, in view of the sheer number of references (well over 200), the Examiner had an impossible task to review all the references submitted by the applicants within the time frame of the 21 months allotted for the entire prosecution of a patent application.

76. On information and belief, the examiner had an impossible task determining the materiality of a reference in view of the number of references submitted in the IDSs, the sheer number of pages if all the references were printed out would be many thousands of pages and reams of paper, coupled with the lack of ability on the examiner to key word search the references since there is no requirement that the patent or a PDF on a non-patent reference be submitted in OCR/searchable form.

77. Applicants and/or their attorney could have submitted the references in OCR searchable form so as to ensure that the examiner could have searched for relevant search terms, but did not do so.

78. On information and belief, the impossibility of the task was compounded by the fact that the applicants intentionally submitted some of these references in abstract format without providing the examiner with a full text copy.

79. Applicants and/or their attorney could have obtained the full-text copy of references, but did not do so. Applicants and/or their attorney filed hundreds of references but failed to take the additional steps to provide full text copies of many references.

80. On information and belief, the impossibility of the task was also compounded by the fact that the applicants intentionally did not organize the references in any way that would be conducive to enabling the examiner to review and assess the materiality of the references.

81. On information and belief, the impossibility of the task was also compounded by the fact that the applicants intentionally did not include a statement with each reference that would have assisted and enabled the examiner to assess the materiality of the references submitted in the IDSs. Applicants ostensibly reviewed each reference to determine if it was relevant and material to the patent application claims. Given the sheer number of references, applicants could have included a statement of relevance or other notation with respect to the reference. But it did not do so.

Applicants knew that the Examiner would not have search capabilities of non-OCR'ed references and knew that the Examiner would not review the references given the sheer number of them.

82. If applicants did not review each reference for its materiality or relevance, then it could not have annotated the reference for the Examiner.

83. On information and belief, the applicants intentionally "buried" the examiner under many references, most of which were insignificant, irrelevant, or immaterial, or otherwise submitted to inundate the examiner.

84. On information and belief, the applicants intentionally "buried" one or more highly material prior art references in the many submitted references, most of which are insignificant.

85. On information and belief, the applicants intentionally "buried" highly material prior art references such as "Olson, Logan M. et al., *Quantitative Assessment of Trace Element Contamination in Parenteral Nutrition Components*, Journal of Parenteral and Enteral Nutrition. Vol. 43, Issue No. 8, Nov 2019. ABSTRACT" ("Olson 2019"). Olson 2019 was submitted as an abstract on the Forms PTO-1449 filed on October 14, 2021, and May 25, 2022, as part of a large group of relatively insignificant references listed on these Form PTO-1449.

86. Olson 2019 teaches that chromium contamination was prevalent in parenteral nutrition products and components. Olson 2019 suggests "reformulation of … multitrace element products *to eliminate chromium*." (Emphasis added). Olson 2019 further suggests studying "the additional contamination that could occur through the compounding and storage processes." Although silicon was not listed specifically in Olson 2019, silicon was known to leach from container components during storage and become an impurity in multitrace element products.

87. Therefore, had the examiner been notified of the relevance of Olson 2019, the examiner would not have allowed the claims, because Olson 2019 would have contradicted the basis for allowance, which was that "the absence of chromium in a trace element composition" was non-

obvious and that "considerably less silicon impurities" in a trace element composition would be surprising. There is no indication that the examiner had noticed or in any way taken into account the teachings of Olson 2019 during the prosecution of the '695 application.

88. On information and belief, but for the applicants' burying one or more material prior art references from the examiner, such as the Olson 2019 reference, no claims of the patent-in-suit would have been allowed and issued.

89. The repeated and continued burying of one or more material references, such as Olson 2019, demonstrates the applicants' inequitable conduct and an intent to deceive the Patent Office.

90. The Patent Office Manual of Patent Examining Procedures, Section 2001.04 states that "there is a duty of candor and good faith which is broader than the duty to disclose material information." It was not enough that applicants submit references to the examiner; here submitting unsearchable PDF's of hundreds of references, comprising thousands of pages, of marginal references, with no annotations or statements of relevance or materiality, and burying highly relevant references in the stacks of references. Rather, the broader duty of candor and good faith, in this context would have required the applicants here to do something more than simply submit the references under a narrower duty of disclosure.

91. The MPEP Section 2004 - Aids to Compliance with Duty of Disclosure, states: "13. It is desirable to avoid the submission of long lists of documents if it can be avoided. Eliminate clearly irrelevant and marginally pertinent cumulative information. If a long list is submitted, highlight those documents which have been specifically brought to applicant's attention and/or are known to be of most significance. See *Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.*, 359 F. Supp. 948, 175 USPQ 260 (S.D. Fla. 1972), aff'd, 479 F.2d 1338, 178 USPQ 577 (5th Cir. 1973), cert. denied, 414 U.S. 874 (1974). But cf. *Molins PLC v. Textron Inc.*, 48 F.3d 1172, 33 USPQ2d 1823

(Fed. Cir. 1995)." This provision clearly states that in long lists of documents, such as here, the applicants should highlight those documents which have the most significance. Here, the applicants provided no annotations to any document to highlight any significance, much less any as being "most significance."

**Inequitable Conduct and Intent to Deceive the Patent Office:**
**The Boullata Declaration**

92. In the Boullata Declaration, Dr. Boullata notes that the trace element cocktails of the current application have met the long-felt need, achieved widespread use and commercial success for trace element supplementation and therefore are not the result of routine optimization and would not have been obvious to a person of ordinary skill in the art.

93. Dr. Boullata notes that multi-elements or multitrace products such as Mutlitrace® 5 and Multitrace® 5 Concentrate were available in various doses.

94. Dr. Boullata notes that the recommendations in Vanek, MD Vincent W., et al. Exhibit B. A.S.P.E.N. Position Paper: Recommendations for Changes in Commercially Available Parenteral Multivitamin and Multi-Trace Element Products. Nutrition in Clinical Practice vol. 27 No. 4 Aug. 2012 440-491. (ASPEN 2012), and Vanek, MD Vincent W., et al. Exhibit C. A.S.P.E.N. A Call to Action to Bring Safer Parenteral Micronutrient Products to the U.S. Market. Nutrition in Clinical Practice vol. 30 No. 4 Aug. 2015 559-569 (ASPEN 2015) merely present general dosing guidelines for PN patients.

95. Dr. Boullata notes that it was not obvious or routine to select from the hundreds of possible formulations and at least 10 elemental components (e.g., zinc, selenium, copper, manganese, chromium, iron, molybdenum, iodine, fluoride, and cobalt), remove some of those 10 components (i.e., chromium, iron, molybdenum, iodine, fluoride, and cobalt), then select specific doses from those hundreds of possible formulations based on various and conflicting doses and

conflicting dosage guidelines; and create new trace element cocktail formulations for adults, pediatric and neonatal patients in all-in-one formulations that did not previously exist.

96. Dr. Boullata notes that ASPEN 2015 explains that iron, iodine and/or fluoride may be beneficial, and that chromium 10 mcg is sufficient for most adult patients and selenium doses higher than 60 mcg are preferred. For most neonatal patients, chromium should be reduced and selenium 2 mcg per kg should be used.

97. Dr. Boullata notes that ASPEN, like Burjonrappa, realized in 2012 the need for "safer and more effective" trace elements and that then existing trace elements needed "significant modifications."

98. Dr. Boullata notes that this need persisted with still no solution in 2015 as ASPEN realized that trace element products available in 2015 had "toxic amounts of manganese, copper, and chromium" and that "safer parenteral multi-TE products'" needed to be developed (*see* ASPEN 2015 at page 563), the FDA also had concerns about the currently available trace elements in 2012 and 2015 and warned manufacturers about unapproved drugs in 2020.

99. Dr. Boullata notes that this long felt need persisted over 8 years until the '695 application was filed and products containing the claimed amounts of specific elements were approved by FDA.

100. Dr. Boullata notes that ASPEN 2012 discloses potentially more than six hundred different formulations that can be made with different combinations of trace elements and different doses per 1 mL.

101. Dr. Boullata notes that notwithstanding ASPEN 2012, there are no adult formulations that disclose as active ingredients about 3,000 µg of zinc, about 300 µg of copper, about 60 µg of selenium, and about 55 µg of manganese without added chromium per 1 mL in an all-in-one trace element combination product.

102. Dr. Boullata notes that Bonjonrappa, ASPEN 2012, ASPEN 2015 and the FDA identified in general terms this long-felt-need but did not suggest the trace element cocktails of the patent-in-suit.

103. On information and belief, Dr. Boullata distinguished the invention in the claims of the patent-in-suit from the conventional formulations on the market by pointing to prior art data supporting his position that current products all contained chromium.

104. On information and belief, Dr. Boullata "cherry picked" selected quotes from the ASPEN guidelines supporting his points. These guidelines contain strong recommendations for new products containing no chromium, which were ignored by the applicants and never brought to the attention of the examiner.

105. On information and belief, regarding chromium and selenium for adults and some pediatric patients, the ASPEN 2015 guidelines recommend that chromium 10 mcg is sufficient for most patients and selenium doses higher than 60 mcg are preferred.

106. On information and belief, ASPEN 2012 recommends that in addition to the current multiple TE products that contain 10–15 mcg/d of chromium, a multiple TE product without added chromium should be made and that chromium contaminates in PN products satisfies the requirements, and therefore, additional supplementation is unnecessary.

107. On information and belief, by mischaracterizing the recommendations in ASPEN 2012 and ASPEN 2015, the applicants acted with deceptive intent during the prosecution of the '695 application and their conduct was inequitable.

108. On information and belief, the Examiner relied on the Boullata Declaration with the expectation that the information in the Boullata Declaration was unbiased, truthful, and with the belief that Dr. James Boullata would not want to perjure himself. Since the examiner presumed the information in the Boullata Declaration was bona fide, the examiner ought to have been apprised of

any other information which could call the information in the Boullata Declaration into question. By relying on incomplete analysis and testing to draw the conclusions in the Boullata Declaration, the applicants acted with deceptive intent during the prosecution of the ’695 application and their conduct was inequitable.

109. On information and belief, the applicants did not attempt to dissuade the examiner from his continued reliance on the Boullata Declaration.

110. On information and belief, but for the applicants’ mischaracterization of the references in the Boullata Declaration, no claim of the patent-in-suit patent would have been allowed and issued.

**Inequitable Conduct and Intent to Deceive the Patent Office: Relationship of Dr. Boullata with Counterclaim-Defendant**

111. On information and belief, Dr. Joseph I. Boullata was a consultant and speaker for Counterclaim-Defendant during the time period of the prosecution of the ’695 application.

112. On information and belief, since the Boullata Declaration was a deciding factor in the outcome of the patent prosecution of the ’695 application, the relationship of Dr. Joseph Boullata and Counterclaim-Defendant was material and should have been disclosed to the examiner.

113. On information and belief, the applicants failed to disclose to the examiner the relationship between Counterclaim-Defendant and Dr. Joseph Boullata.

114. On information and belief, the examiner relied on the Boullata Declaration with the expectation that the information in the Boullata Declaration was unbiased, truthful, and with the belief that Dr. James Boullata would not want to perjure himself. Since the examiner presumed the information in the Boullata Declaration was bona fide, the examiner ought to have been apprised of any other information which could call the information in the Boullata Declaration into question.

115. On information and belief, the repeated and continued omissions and withholding

of material information by the applicants from the examiner demonstrate the applicants' inequitable conduct and intent to deceive the Patent Office.

116. On information and belief, the applicants did not attempt to dissuade the examiner from his continued reliance on the Boullata Declaration,

117. On information and belief, but for the applicants' continued failure to disclose to the examiner the material information that Dr. Joseph Boullata was a consultant and speaker for Counterclaim-Defendant, no claims of the patent-in-suit would have been allowed and issued. The examiner was deprived of any ability to evaluate any bias, financial stake, or the like by Dr. Boullatta.

**<u>Inequitable Conduct and Intent to Deceive the Patent Office:</u>**
**<u>The James Declaration</u>**

118. In the James Declaration, Dr. James presents comparative data showing unexpectedly reduced elemental impurities of Tralement®.

119. Dr. James notes that Multitrace® 5 Concentrate, among other things, has higher amounts of elemental impurities such as silicon and aluminum, is of poorer quality, and is less stable when compared to the Tralement® finished drug product.

120. Dr. James notes that the commercial lots of Multitrace® 5 Concentrate unexpectedly had almost six times more silicon in it compared to the Tralement® formulation.

121. Dr. James notes that the combination of trace elements of the claims of the patent-in-suit not only has unique trace element combinations and unique doses of active ingredients of elemental zinc, copper, manganese, and selenium per 1 mL of the formulation, but also has an unexpected purity and stability when compared to the Multitrace® 5 Concentrate formulation.

122. Dr. James notes that impurities can leach from the vial and/or stopper and into the formulation, and not only affect product stability and purity, but also can be harmful to the patient

when administered.

123. Dr. James notes that increased elemental Si levels precede glass degradation events, making Si levels in solution a primary indicator of glass delamination.

124. In the James Declaration, Dr. James presents comparative tests to determine levels of elemental impurities in the Tralement® formulation compared to the Multitrace® 5 Concentrate formulation.

125. In the James Declaration, Dr. James also presents comparative data showing improved lower bacteria endotoxin limits for Tralement®@ and Multrys®.

126. Dr. James notes that the data was obtained by testing for the presence of endotoxins in what is called a Bacterial Endotoxins Test (BET). The endotoxins are measured in Endotoxin Units per milliliter (Eu/m1). The Tralement® formulation has a more stringent limit of NMT 50 EU/mL, which is 2 times less than Multitrace® 5 Concentrate. The Multrys® formulation has an even more stringent limit of NMT 16,67 EU/L, which is over 7 times less than Multitrace ® 5 Concentrate.

127. Dr. James notes that in order to meet the reduced BET Limit for the Tralement® formulation and the even more reduced BET Limit for the Multrys® formulation and provide safer products with regard to potential bacterial endotoxins, the raw materials for the Tralement® and the Multrys® formulations must be of an improved quality.

128. Dr. James notes that the Tralement® and Multrys® formulations have a unique combination and unique doses of trace elements, a unique stability and purity profiles, and significantly improved qualities such as lower EU/mL which is not obvious in view of Multitrace® 5 Concentrate, which has a significantly higher BET limit of 125 EU/mL.

129. On information and belief, in Table E of the James Declaration, a comparison is made between apparently a single determination of a random, single batch of commercial

Multitrace® 5 Concentrate versus a single determination of a random, single batch of Tralement®, which is unreliable.

130. On information and belief, there is no indication that replicates (repeated determinations) of the measurement were performed, or that more than one sample of each group was analyzed. If multiple determinations and samples were analyzed, there is no indication of the standard error of the measurements. Therefore, there is no guarantee that these results are even statistically significant.

131. On information and belief, in view of the unlikely results presented in Table E, a more comprehensive process should have been undertaken to support the conclusions, using multiple complementary tests, following best demonstrated processes as indicated in the USP.

132. On information and belief, in addition to having only one determination from a single batch compared for each of the two groups, there are many reasons that could account for higher silicon levels, assuming that this difference even was statistically significant.

133. On information and belief, these reasons include the glass forming time, the temperature at the neck of the vial, the annealing temperature, the glass forming technology, the surface treatment, and the type of glass composition all of which can potentially trigger delamination.

134. On information and belief, the characteristics of drug product solution in contact with the glass may also impact glass delamination. Acidic solutions cause the diffusion of water and exchange of hydrogen ions with the alkali ions such as sodium and potassium ions. Highly basic solutions (≥ 8) cause the dissolution of silicon oxide layer.

135. On information and belief, the presence of buffers in the drug product solution, such as phosphates and citrates, can interact with the glass vials causing not only dissolution of elements present in the glass but also interact with the glass causing the delamination.

136. On information and belief, the conclusion that the absence of chromium had anything to do with silicon levels, in view of the myriad of other possible causes, is unfounded. For example, hydroxyl ions attack silicon-oxygen compounds in alkaline solutions—in other words the structure of the glass. On the other hand, in acidic solutions, an exchange of ions takes place between hydrated protons and sodium or other alkaline ions in the glass (leaching).

137. On information and belief, in view of this unlikely result, a more comprehensive process should have been undertaken to support the conclusions of the James Declaration.

138. On information and belief, Dr. James and the applicants were aware that the information provided to the USPTO was not reliable or was misleading as to the conclusions drawn, which were formed in order to obtain allowance of the patent claims that otherwise would not have issued.

139. On information and belief, the examiner relied on the James Declaration with the expectation that the information in the James Declaration was unbiased, truthful, and with the belief that Dr. Roshan James would not want to perjure himself. Since the examiner presumed the information in the James Declaration was bona fide, the examiner ought to have been apprised of any information that could call the information in the James Declaration into question. By relying on incomplete analysis and testing to draw the conclusions in the James Declaration, the applicants acted with deceptive intent during the prosecution of the ’695 application and their conduct was inequitable.

140. On information and belief, the applicants did not attempt to dissuade the examiner from his continued reliance on the James Declaration.

141. On information and belief, but for the applicants’ incomplete analysis and testing to draw the conclusions in the James Declaration, omissions and withholding of material information from the examiner, no claims of the patent-in-suit would have been allowed and issued.

142. Each of the instances recited herein relating to the burying of references, the failure to disclose the relationship of Dr. Boullata and the failures recited therein, and the failures in the James Declaration individually or collectively could lead a reasonable trier of fact to find inequitable conduct in obtaining the patent-in-suit.

143. The most reasonable inference that can be drawn is that the applicants were aware that: (i) the underlying Multrys and Tralement approved drug product were not yet protected by any patent that could be listed in the Orange Book; (ii) without any patent in the Orange Book, subsequent ANDA filers could file ANDA's without a so-called Paragraph IV certification in the ANDA; (iii) the lack of a Paragraph IV certification would not require ANDA filers to notify American Regent Inc. of the ANDA filing through the so-called Notice Letter; (iv) the lack of any Notice Letter would deprive American Regent Inc. of filing a preemptive patent infringement lawsuit under the Hatch Waxman Act; (v) the inability to file a preemptive lawsuit would deprive American Regent Inc. of the so-called 30-Month stay; (vi) without a 30-Month stay in place, ANDA sponsors could obtain full and final approval and launch competitive generic versions to Tralement and Multrys; (vii) American Regent Inc. had a high interest in ensuring that the patent would issue before ANDA sponsors could file ANDA's; (viii) by submitting hundreds of references in unsearchable form inundated the Examiner; (ix) failing to disclose the relationship of the declarants and/or the defects in the declaration; and (x) American Regent Inc. specifically and intentionally deceived the Patent Office Examiner in separate instances and/or in a pattern of deception.

## PRAYER FOR RELIEF OF DEFENDANT

WHEREFORE, Counterclaim-Plaintiff respectfully requests that the Court enter judgment in their favor and against Counterclaim-Defendant as follows:

A. Denying Counterclaim-Defendant claims and dismissing Plaintiff's Complaint

with prejudice;

B. Declaring that the claims of the patent-in-suit are invalid and unenforceable;

C. Declaring that the claims of the patent-in-suit are not, and will not be, infringed by Counterclaim-Plaintiff's manufacture, use, sale, offer for sale, or importation of the ANDA Products;

D. Preliminarily and permanently enjoining Counterclaim-Defendant, its officers, agents, servants, employees, attorneys, and any person who acts in concert or participation with Counterclaim-Defendant, from utilizing the patent-in-suit to block, hamper, hinder or obstruct FDA approval of the ANDA Products;

E. Permanently enjoining Counterclaim-Defendant, its officers, agents, servants, employees, attorneys, and any person who acts in concert or participation with Counterclaim-Defendant, from asserting or otherwise seeking to enforce the patent-in-suit against Counterclaim-Plaintiff or anyone in privity with Counterclaim-Plaintiff;

F. Declaring this case exceptional and awarding Counterclaim-Plaintiff its attorneys' fees pursuant to 35 U.S.C. § 285, the inherent power of this Court, or otherwise.

G. Awarding costs to Counterclaim-Plaintiff; and

H. Awarding to Counterclaim-Plaintiff any other such and further relief as is just and proper.

Dated: May 9, 2024

Respectfully submitted,

*/s/ Eric I. Abraham*

Eric I. Abraham (eabraham@hillwallack.com)
William P. Murtha (wmurtha@hillwallack.com)
**HILL WALLACK LLP**
21 Roszel Road
Princeton, NJ 08540
T: (609) 924-0808
F: (609) 452-1888

**CERTIFICATION OF SERVICE**

I hereby certify that on May 9, 2024, the forgoing Answer and Counterclaims on behalf of RK Pharma was filed via the Court's electronic filing system. I also caused to be served a courtesy copy of the foregoing Answer and Counterclaims upon all counsel of record via email.

Dated: May 9, 2024

*/s/ Eric Abraham*__
ERIC I. ABRAHAM

Eric I. Abraham (eabraham@hillwallack.com)
William P. Murtha (wmurtha@hillwallack.com)
**HILL WALLACK LLP**
21 Roszel Road
Princeton, NJ 08540
T: (609) 924-0808
F: (609) 452-1888

*Attorneys for defendant, RK Pharma Inc.*